UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

D.A., on behalf of herself and her minor child, J.V.,

                                    Plaintiffs,            Civ. No. 20-cv-5175

                                                    COMPLAINT

                  - against -

NEW YORK CITY DEPARTMENT OF EDUCATION
NEW YORK CITY BOARD OF EDUCATION, AND
CHANCELLOR RICHARD CARRANZA IN
HIS OFFICIAL CAPACITY,

                                   Defendants.

_____

## PRELIMINARY STATEMENT

1. This is an action alleging that Defendants, the New York City Department of Education, the Chancellor of the New York City Schools, in his Official Capacity, and the Board of Education (collectively "Defendants"), violated Plaintiffs' rights under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 ("Section 504"), as well as New York State law.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiffs' federal claims under the IDEA pursuant to 20 U.S.C. § 1415, 42 U.S.C. § 1988, and as an action raising a federal question under 28 U.S.C. § 1331.

3. This Court has pendent jurisdiction over the Plaintiffs' New York State law claims.

4. Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which Defendants are situated and/or reside.

## PARTIES

5. Plaintiff, D.A., is the mother and natural guardian of J.V., a ten-year-old child who has been diagnosed with, *inter alia*, an Autism Spectrum Disorder ("Autism").[1]

6. D.A. and J.V. reside in the County of Queens in New York State.

7. J.V. is a student with a disability who is eligible for a Free Appropriate Public Education ("FAPE") under the IDEA.

8. J.V. is also a qualified individual with a disability that is eligible for a FAPE under Section 504 and is protected from discrimination based upon his disability.

9. Upon information and belief, THE NEW YORK CITY DEPARTMENT OF EDUCATION ("Department" or "DOE") is a local educational agency ("LEA") as defined in the IDEA, and thus bears the responsibilities of an LEA under the IDEA and in the New York State Education Law.

10. Upon information and belief, the DOE is charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York, including programs and services for students with disabilities.  N.Y. Educ. Law § 2590-g (McKinney 1980).

11. Defendant, THE NEW YORK CITY BOARD OF EDUCATION ("the Board of Education" or "the Board"), was or continues to be the official body charged with the responsibility of developing policies with respect to the administration and operation of the public schools in the City of New York.

---

[1] Initials are used throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA and the Family Educational Rights and Privacy Act of 1974 ("FERPA").

12. Upon information and belief, Defendant, RICHARD CARRANZA ("the Chancellor"), is the Chancellor of the New York City School District and, as such, is entrusted with the specific powers and duties set forth in N.Y. Educ. Law § 2590-h.

13. All Defendants jointly and/or individually constitute the LEA under the IDEA and state law.

14. All Defendants jointly and/or individually are recipients of federal financial assistance.

15. When the "DOE" is referenced throughout, the term DOE refers individually to Defendants DOE, as well as collectively to Defendants.

## LEGAL FRAMEWORK

16. The IDEA guarantees that all eligible children with disabilities, ages three through twenty-one, must be offered a FAPE.  20 U.S.C. § 1412(a)(1).

17. A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d) (1) (A)-(B).

18. A FAPE must "include an appropriate . . . secondary school education in the State involved" and be provided in conformity with an IEP.  *See* 20 U.S.C. §§ 1401(9), 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).

19. To be entitled to a FAPE, a child must have one or more of thirteen disabling conditions and, by reason of his/him disability, require "special education" and "related services." 34 C.F.R. § 300.8(a)(1).

20. J.V.  has been classified by Defendants with Autism, which is one of the thirteen listed disabilities.  34 C.F.R. § 300.8(a)(1).

21. Defendants are responsible for providing a FAPE to all eligible children in New York City and for promulgating policies and procedures in accordance with the IDEA.

22. Every child with the designated disability classifications is entitled to an Individualized Education Program, or "IEP" and the LEA (here, Defendants) must provide an IEP which must is individually tailored to each student and is meant to serve as a blueprint for each child's special education services.  20 U.S.C. § 1414(d).

23. By the beginning of each school year, City Defendants must have an IEP in place that offers a FAPE to each eligible child.  20 U.S.C. § 1414(d)(2).

24. Before an IEP can be developed, a child must be evaluated in accordance with detailed procedures outlined in federal and state law.

25.  A child is reevaluated in accordance with the same standards at least once every three years, or more frequently if a parent or school district believes it is necessary.

26. Among other things, an IEP must be developed by a properly constituted IEP team that includes particular members, including the parent and a district representative who is knowledgeable about the services and able to commit district resources.  20 U.S.C. § 1414(d)(1)(B).

27. The IEP team must meet at least annually, and more frequently, if necessary, to modify a child's services and/or to address "[a] lack of expected progress toward the annual goals and in the general education curriculum."  20 U.S.C. § 1414(d)(4)(A)(ii)(I).

28. The IDEA broadly defines the categories of services that must be offered, which include, but are not limited to, special education, related services, supplementary aids and services, transition services, assistive technology ("AT"), and positive behavioral supports and services (collectively "Special Education Services").

29. The IDEA prescribes, in detail, the process for developing IEPs and their contents.  20 U.S.C. § 1414(d)(1)(A), (d)(2); 34 C.F.R. §§ 300.320(a)(2)-(3); 300.324; N.Y. Educ. Law § 4401, *et seq.;* and 8 N.Y.C.R.R.§ 200.4(d)(2)(iii)

30. For example, an IEP must contain the results of a child's most recent evaluations, as well as an accurate and consistent description of his/him strengths and present levels of academic achievement and functional performance (called "Present Levels of Performance" or "PLPs").  20 U.S.C.  § 1414(d)(1)(A).

31. An IEP must contain "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modification or supports for school personnel that will be provided for the child."  20 U.S.C. § 1414(d)(1)(A)(i)(IV).

32. Each IEP must also contain research-based instructional strategies unless they are not feasible, including  positive behavioral interventions and supports for children whose behavior impedes their learning and/or that of others. 34 C.F.R. §§ 300.320(a)(4), 300.324(a)(2)(i); 8 N.Y.C.R.R. §§ 200.4(d)(2)(v)(b), 200.4(d)(3)(i).

33. An IEP team must also consider whether a student would benefit from assistive technology ("AT.")  34 C.F.R. §§ 300.5, 300.6, 300.105, 300.324(a)(2)(v).

34. The Defendants are obligated to make decisions about IEPs, services and placements based on student's individual needs, and not policies, procedures or availability of resources.

35. One of the IDEA's most well-known due process rights is the right to request an impartial hearing "with respect to any matter relating to the identification, evaluation, or educational placement of [a] child" or the provision of FAPE to a child.  20 U.S.C. § 1415(b)(6)(A).

36. Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State Educational Agency ("SEA")] or by the Local Education Agency ("LEA") as determined by State law or by the [SEA]." 20 U.S.C. § 1415(f)(1)(A).

37. The IDEA sets forth detailed requirements for hearing procedures.  20 U.S.C. §1415(f); 34 C.F.R. §§ 300.511-516.

38. In New York City, City Defendants are responsible for ensuring that impartial hearings comport with the IDEA's requirements.

## FACTS

39. J.V. is diagnosed with Autism Spectrum Disorder (ASD), Attention Deficit Hyperactivity Disorder (ADHD), and Developmental Delay.  As a result, J.V.'s learning has been impacted.

40. J.V.'s classification on his individualized education program ("IEP") is "Autism."

41. Due to his disabilities, J.V. exhibits delays in expressive and receptive communication, academics, cognition, functional skills, and motor skills.  In addition, he has difficulty attended to task, a tendency to elope and displaying other unsafe behaviors.

42. J.V. exhibits sensory issues such as sensitivity to sound, and a dislike of getting his hands dirty and bathing.

43. J.V. received special education services through Early Intervention ("EI") where he received 3 hours per day of ABA therapy as well as PT, OT, and Speech Therapy 3x30.

44. At three years old, he was transferred into the jurisdiction of the Committee on Preschool Special Education and began attending a Life Skills special education preschool in a 6:1:2 and thereafter an 8:1:3 setting.

45. When J.V. turned five years old, he was transferred into the jurisdiction of the Committee on

Special Education.

**Impartial Hearing Case # 159864 and the 2015-2016 School Year**

46. During the 2015-2016 School year J.V. was recommended to attend a 6:1:1 program on a 12
    month basis and placed at P277 @315 following his Turning 5 review.

47. The DOE refused to recommend home based services despite recommendations from the
    student's providers of his need for home-based services, including ABA therapy.

48. Despite a recommendation for occupational therapy and physical therapy on the 2015 IEP,
    the student did not receive these mandated services in school. When the parent inquired
    about the lack of mandated services the parent was met with inconsistent and dismissive
    information from the school staff.

49. The parent filed a due process complaint, *pro se,* on February 11, 2016, which was
    designated as Impartial Hearing Case Number  ("Case No.") 159864 to compel the DOE to
    provide the mandated services and provide compensatory relief for the missed sessions.

50. On March 18, 2016 the DOE convened to draft an IEP for the 2016-2017 school year. The
    March 18, 2016 IEP classified the student with a Speech and Language Impairment and
    recommended an 8:1:1 program in a District 75 school.

51. On April 21, 2016 IHO Agostin rendered an interim order ordering the case to be remanded
    to the CSE to develop a new IEP in light of a new evaluation procured by the parent.

52. On May 6, 2016 the DOE reconvened and held a new IEP meeting. The May 6, 2016 IEP
    was nearly identical to the previous March 18, 2016 IEP.

53. On May 23, 2016 IHO Linda Agostin issued a decision for Impartial Hearing Number
    159864 ordering the following:

    "Therefore, it is hereby ordered that the DOE shall pay for following: (1) 20 hours

of PT and (2) 60 hours of OT from a certified and licensed OT and PT provider at the enhanced rate not to exceed $125 per hour. The 20 hours of PT and 60 hours of OT is to be provided to the parent beyond the 2015- 2016 year until the hours are used and this order is in effect until June 30, 2018"

54. The student remained at P277 for the entirety of the 2015-2016 school year.

55. P277 remained an inappropriate placement for this student as they have failed to conducted appropriate evaluations and have failed to recommend appropriate supports and services despite repeated requests by the parent.

56. Despite the IHO's order to reconvene in light of the new evaluation provided by the parent, the DOE ignored the recommendations for 1:1 ABA therapy contained in the evaluation and kept the identical recommendations that were contained in the previous IEP.

57.  Both the March and May 2016 IEPs were deficient in that the DOE failed to provide a functional behavior assessment or include a behavior intervention plan despite reports of interfering behaviors.

58. Further, although the parent explained and the IEPs reflect that the student requires 1:1 instruction, no recommendations were made in the IEP for the student to receive any 1:1 instruction.

59. The student was twice recommended to remain in an 8:1:1 placement in a District 75 school despite his lack of progress.

**Impartial Hearing Case # 162150 and the 2015-2016 and 2016-2017 School Years**

60. On August 23, 2016, the Parent, through counsel, filed a due process complaint regarding the DOE's failure to provide J.V. with a FAPE for the 2015-2016 and 2016-2017 school years (the "2016 DPC").

61. Defendant DOE assigned the August 2016 DPC a Case No. of 162150.

62. The allegations in the August 2016 DPC are incorporated herein by reference.

63. During the course of the hearing, upon information and belief, the DOE failed to implement the student's related services that were mandated on his IEP and that constituted his stay-put placement under the IDEA.

64. April 27, 2017, IHO Martin Kehoe ruled in favor of the Parent and issued a Findings of Fact and Decision (the "2017 Decision"), ordering, *inter alia*, the following:

   a. This matter shall be remanded to the CSE for deferment to the [Central Based Support Team] in accordance with this decision. It is anticipated that an appropriate school placement will include ABA services at school and at home;

   b. If the CBST fails to affect a suitable placement within 90 days, the District shall provide the Student with 35 hours/week of ABA SETTS services (25 at school; 10 at home) *for one school year*. After this time, the CSE shall reconvene to determine whether the same services shall be rendered going forward;

   c. Regardless of the above, the District shall provide a bank of 200 hours of ABA services to be used at the discretion of the Parent over the next three years in anticipation of scheduled breaks in the school year;

   d. The District shall provide 5 hours/week of OT services for one school year. After this time, the CSE shall reconvene to determine whether the same services shall be rendered going forward;

   e. The District shall provide payment for an independent assistive technology evaluation, upon presentation of an invoice for same. Parent shall share the results of the evaluation with the CSE;

    f.   The District shall provide payment for an independent neuropsychological evaluation, upon presentation of an invoice for same. Parent shall share the results of the evaluation with the CSE;

    g.   The District shall provide parent training and counseling for at least two hours per month;

    h.   The District shall provide a 1:1 transportation paraprofessional;

    i.   The District shall order the production of a Functional Behavioral Assessment (FBA) and Behavioral Intervention Plan (BIP), once the Student is attending his new school or receiving his new services. In the event a non-public school placement is not found within 90 days then the District shall pay for an independent FBA and BIP upon presentation of an invoice for same. Parent shall share the results of the FBA and BIP with the CSE.[2]

65. The Defendants failed to appeal the 2017 Decision.

66. The Defendants did not timely or appropriately implement the 2017 Decision.

67. On January 30, 2020, Plaintiffs, through counsel, submitted a written request to the Defendant, DOE, for payment of attorney's fees incurred in connection with the impartial hearing ("Fee Claim") to the Defendants' designated email address set up to receive requests for payment of legal fees following impartial hearings.

68. Defendants have a procedure and practice pursuant to which they attempt to settle claims for IDEA attorney's fees, such as the Fee Claim, to avoid parents filing claims in Court.

69. Often, Defendants will agree to extend the statute of limitations for filing fee claims to give parties the opportunity to negotiate and resolve claims prior to filing in Court.

---

[2] The Decision inexplicably did not address the Parent's request for additional speech therapy based on the independent evaluation of Nancy Gorry dated December 2016, entered into Evidence as Exhibit S.

70. On February 3, 2020 the DOE confirmed receipt of the Plaintiffs' Fee Claim and assigned the Fee Claim to a lawyer who was purportedly tasked with trying to resolve the Fee Claim.

71. Defendants' never made an offer on the fee claim.

72. Plaintiffs attempted to follow up with Defendants to obtain a response.

73. The Defendants' attorney advised that he would investigate and determine whether the Defendants wished to try to settle this fee claim.

74. On June 29, 2020, Defendants advised that they did not plan to try to settle this fee claim and refused to make any offer on the claim.

75. Following that response, Plaintiffs had no choice but to file this action.

**Case No. 174246 and the 2017-2018 and 2018-2019 School Years**

76. On May 9, 2017, the DOE held an IEP meeting. At the meeting, without notice to the parent, the IEP team insisted that, in addition to conducting an IEP reconvene per IHO Kehoe's Decision, the team would also conduct an annual review.

77. The IEP team recommended, *inter alia*, the following: deferment to CBST for NPS placement, parent counseling and training for 2 hours per month, a 1:1 transportation paraprofessional, OT 5x60 per week, 25 hours of ABA services per week in the school, and 10 hours of ABA services per week at home.  The IEP team also stated that the parent counseling and training, and OT services will be funded through DOE's Implementation Unit.

78. Prior to the May 2017 IEP meeting, the Parent submitted, through her attorney, an independent speech and language evaluation to J.V.'s IEP team conducted in December 2016 by Nancy Gorry, a licensed speech language pathologist, recommending that J.V. receive SLT 5x60/week.

79. The May 2017 IEP did not include ABA as push in or after school despite the IEP team at the May 2017 IEP meeting agreeing to add it to J.V.'s IEP as per the IHO order.  The Implementation Unit ultimately authorized the ABA services as both push in and after school (but again only until May 2018 despite the Order specifically directing those services for a school year).

80. After intervention from the Parent's counsel, the DOE agreed that the funding under the last FOFD should be extended to June 30, 2018.

81. The CBST did not locate a placement.

82. The school failed to cooperate with the independent evaluators, nor the ABA providers ordered by IHO Kehoe

83. Dr. Lindsay Lawlor, from BridgeKids, conducted an independent FBA and BIP, authorized by IHO Kehoe. Based on the results of the FBA, Dr. Lawlor recommended the following for J.V.:

      a.  The development of a BIP that can be consistently implemented across all environments is required to manage J.V.'s interfering behavior. The BIP must address all functions of the target behaviors and should be created and monitored by a BCBA.

      b.  J.V.'s services at home and school require supervision by a BCBA to provide behavioral training and supervision to the current teachers and therapists working with J.V.

      c.  25 hours of 1:1 ABA services per week at school and 10 hours of 1:1 ABA services per week in the home by skilled behavior therapists to

further address interfering behaviors that will continue to impact his

learning.

d.  Parent Training provided by a BCBA is needed to provide Parent support

and education on managing J.V.'s interfering behaviors in the home.

84. Rachel Bouvin, M.S., CCC-SLP completed an independent AT evaluation, authorized by

IHO Kehoe, on July 7, 2017.  The evaluation was faxed to the CSE on September 25, 2017.

She determined that J.V. "demonstrated the required skills necessary to be a dynamic SGC

(speech-generating device) user".

85. Based on her evaluation Ms. Bouvin recommends J.V. be provided with:

a.  An iPad Mini 4 with 256 GB;

b.  TouchChat HD-AAC with WordPower Speech Application;

108 SS with Keyboard Vocabulary set to J.V.'s profile;

c.  ChatWrap Series 8-amp case by Silver Kite, with shoulder strap;

d.  Handled Amplifier;

e.  ChatWrap Carrying Case;

f.  Zagg Invisible Shield;

g.  50 hours of training for J.V. (inclusive of parent training).

86. An independent neuropsychological evaluation, authorized by IHO Kehoe, was completed by

Dr. Pio Andreotti, PsyD. on or about December 2017.  The evaluation was faxed to the CSE

on January 31, 2018.  Dr. Andreotti's recommendations include:

a.  that J.V. be placed in a small, structured, supportive class with a high

teacher-to-student ratio to address his significant social/pragmatic skills

deficits and attention weaknesses while providing a curriculum to

develop his academic skills;

    b.  it is strongly recommended that he continue to receive 1:1 behavioral

         instruction (i.e., ABA). These services should be provided under the

         supervision and support of a Board-Certified Behavior Analyst (BCBA);

    c.  1:1 discrete trial ABA services outside of school. These services should

         be provided under the supervision and support of a BCBA;

    d.  J.V.'s parents should also be provided parent training resources to

         provide them with support in maintaining these plans at home;

    e.  Due to J.V.'s visual-spatial weaknesses, Occupational Therapy services

         are recommended to continue;

    f.  Given J.V.'s pragmatic language weaknesses, it is recommended that J.V.

         continue to receive Speech-Language Therapy; and

    g.  J.V. should also continue to receive Physical Therapy services.

87. The failure of the DOE to offer J.V. an appropriate IEP and placement and resulting FAPE

    deprivations for the 2018-2019 school year led the parent to request an Impartial Hearing

    on June 29, 2018 under IH No. 174246.

88. On July 18, 2018, an IHO issued an Order on Pendency directing the following:

    a.  District 75 classroom with eight students, one teacher and one

         paraprofessional,

    b.  Thirty-five hours of Applied Behavior Analysis services per week,

         with twenty- five hours at school and ten hours at home,

    c.  Five hours of Occupational Therapy at home per week,

    d.  Two hours of Parent Training per month, (e) a

    e.  Transportation paraprofessional

    f.  Twelve-month school year.

89. J.V. attended P.S. 277Q @ 76 with a 1:1 crisis-paraprofessional and the provision of 25 hours per week of 1:1 ABA therapy services in class provided by Province Therapeutics.

90. J.V. also received center-based services at Province Therapeutics for the 2018-2019 school year. He received intensive behavior support in the form of ABA therapy while receiving the educational services. J.V. made steady progress in his goals and learned skills quickly with direct instruction and potent reinforcement. J.V. requires constant support and careful supervision in all areas of his daily functioning; he needs frequent prompts to stay on task.

91. J.V. began the 2018-2019 school year attending P.S. 277Q @ 76.

92. As the school year progressed J.V. began to display an increase in maladaptive behaviors within the classroom; primarily elopement during non-preferred activities and increased self- injurious behaviors such as biting and body slamming or banging.

93. As per the pendency order issued by IHO Hill under Impartial Hearing No. 174246 J.V. was only provided with 25 hours of 1:1 ABA therapy in school.

94. As such, J.V.'s 1:1 ABA therapist could only provide services to J.V. from 8 AM until 1 PM.

95. J.V. was left without any 1:1 services for the remainder of the school day, nearly two hours daily, during which time his maladaptive and self-injurious behaviors presented themselves with increased severity and intensity.

96. Despite the above, On or about December 18, 2018, the SBST team conducted an IEP meeting. An IEP produced as a result of this meeting ("December 2018" IEP) recommended the following: a 6:1:1 Special Class in a Specialized School, weekly

individual Occupational Therapy 5x30, weekly individual Speech & Language Therapy 3x30, Parent Training five times per year for sixty minutes, weekly individual Physical Therapy 2x30, Full-time 1:1 Behavior Support Para-professional and a 1:1 Transportation Paraprofessional.

97. The parent and the student's ABA therapist advised as to their disagreement with the SBST's recommendations; noting that the reduction in related services and recommendations made within the IEP would not provide J.V. with the intensive individualized supports and services he needs to manage his maladaptive behaviors and needs across most major academic, social and communicative domains.

98. The parent received the IEP created as a result of the December 18, 2018 IEP meeting on or about January 29, 2019.

99. The resulting IEP was fraught with substantive and procedural errors which denied J.V. a FAPE

100.    On March 18, 2019, Plaintiffs concluded her case in chief in Case No. 174246.

101.    On or about May 1, 2019 IHO Vanessa Gronbach was assigned as the new hearing officer.

102.    D.A. requested a transfer and, as of March 26, 2019, J.V. began attending P.S. 224 @ 205Q.

103.    Upon J.V.'s enrollment at P.S. 224 @ 205Q; the Parent was advised that they were unable to fulfill J.V.'s mandate of a 1:1 transportation paraprofessional.

104.    Without the provision of a 1:1 transportation paraprofessional, J.V. would not be allowed to board the school bus providing special education transportation to his daily program.

105.    The DOE was unable to staff this mandated service for J.V. for nearly eight weeks. In the intervening time period, J.V. missed numerous days of school-based instruction.

106.    The parent expended much of her own employer awarded Family Medical Leave Act (FMLA) hours to facilitate J.V.'s arrival and pick-up to P.S. 224 @ 205Q in addition to cobbling together a patchwork of private rideshare services and family pick-ups and drop-offs.

107.    On or about May 24, 2019, the Parent through counsel and collaboration with the DOE Implementation Unit identified a provider agency that would be able to fulfill J.V.'s mandate on a consistent basis.

108.    J.V. continued to require intensive individualized support to address his behavioral needs however, once again the DOE failed to increase the 1:1 ABA support therapy provided to J.V. in school.

109.    On or about June 5, 2019, D.A. was advised of the need to participate in a school-based call to discuss several incidents pertaining to J.V.'s behaviors in class and involving school staff.

110.    The parent participated in the school-initiated behavior conference call with the principal of the school and the head of the ABA provider agency.

111.    During the course of the call, the principal of P.S. 224 @ 205Q described J.V.'s behaviors as escalating and beyond the control of school staff. Principal Park advised that the school place J.V. in a padded room when his behaviors increased and would be forced to employ the use of Emergency Personnel Services when J.V.'s behaviors exceed the control of the school-based staff.

112.    D.A. raised her concern that there was no functional behavior assessment or behavior intervention plan ("BIP") in place and objected to the use of 911 to manage her child's behavior.

113.    The principal advised D.A. that the school was not experienced in working with students with J.V.s characteristics.

114.    On or about June 26, 2019, the parent received an end of year report card from P.S. 224 @ 205Q which advised that "J.V. continues to require the service of a 1:1 and an ABA specialist throughout the school day to maintain appropriate behaviors."

115.    IHO Vanessa M.Gornbach ruled in favor of the Parent and issued a Findings of Fact and Decision on May 8, 2019 (the "2019 Decision") it is hereby ordered:

> a.    ORDER THAT, the District shall provide the Student with an appropriate non-public school (approved or non-approved) that provides full-day, 1:1 ABA instruction under the supervision of a Board-Certified Behavior Analyst/Licensed Behavior Analyst (BCBA/LBA), for a 12- month/extended school year;
>
> b.    ORDER THAT, if the District cannot locate an appropriate non-public school (approved or non-approved) that provides full-day, 1:1 ABA instruction under the supervision of a Board- Certified Behavior Analyst/Licensed Behavior Analyst (BCBA/LBA), for a 12- month/extended school year, within 15 school days of this Order, that the District shall continue to fund the program located by the Parent;
>
> c.    ORDER THAT, the District shall provide or fund related services of speech language therapy (5x60 per week), occupational therapy (5x60

per week); physical therapy (4x30 per week), on a 12-month basis, to be provided by providers of the Parent's choosing, at market rate; 4). ORDER THAT, the District shall provide the Student with 20 Hours of 1:1 afterschool/center-based ABA therapy to be provided by an ABA therapist of the Parent's choosing, at market rate;

d. ORDER THAT, the District shall provide the Student with 5 Hours weekly of BCBA supervision to be provided by an BCBA of the Parent's choosing, at market rate;

e. ORDER THAT, the District shall provide the Student with 1 Hour weekly of BCBA program development, to be provided by a provider of the Parent's choosing at market rate;

f. ORDER THAT, the District shall provide the Student with 1 Hour weekly of Parent counseling and training to be provided by an ABA therapist of the Parent's choosing, at market rate;

g. ORDER THAT, the District shall provide the Student with special education transportation to and from the nonpublic school, with limited travel time and a 1:1 paraprofessional;

h. ORDER THAT, the District shall reimburse the Parent for transportation costs during the 2019-2020 school year, starting in July 2019, upon the production of receipts.

i. ORDER THAT, the District's CSE shall reconvene to develop an IEP which recommends: placement in a non-public school that provides full-day, 1:1 ABA instruction under the supervision of a Board-Certified

Behavior Analyst/Licensed Behavior Analyst (BCBA/LBA), for a 12-month/extended school year; related services of speech language therapy (5x60 per week), occupational therapy (5x60 per week); physical therapy (4x30 per week); 20 Hours of 1:1 afterschool/center-based ABA therapy; 5 Hours weekly of BCBA supervision; 1 Hour weekly of Parent counseling and training; assistive technology supports; and special education transportation to and from the nonpublic school, with limited travel time and a 1:1 paraprofessional.

116.    The Defendants failed to appeal the 2019 Decision.

117.    The DOE, however, did not implement all elements of the 2019 Decision in IH Case Number 174246.

**Case No. 184629 and the 2019-2020 School Years**

118.    On July 1, 2019, D.A. filed a due process complaint regarding the DOE's failure to provide J.V. with a FAPE for the 2019-2020 school years (the "2019 DPC").

119.    In a corrected pendency order issued on July 30, 2019, the IHO ordered that the DOE "shall provide" the following during pendency:

a.    Placement in a full time 1:1 ABA center based school program in an nonpublic or private school setting, on a 12-month basis;

b.    Related services of speech language therapy (5x60 per week), occupational therapy (5x60 per week); physical therapy (4x30 per week);

c.    Special education transportation with limited travel time and a 1:1 paraprofessional

d.    20 hours per week of ABA services in the home;

20

    e.    Four hours per week of BCBA supervision; and

    f.    Four hours of parent counseling and training per month.

120.    The Defendants were unable to implement the IHO's prior order or pendency, leaving the Plaintiffs to her own devices to try to find a program to implement the order.

121.    J.V. was then enrolled at a private school for the 2019-20 school year, starting in July 2019, because the DOE was unable to implement the student's stay-put placement.

122.    However, J.V. was unable to remain in that program for the entire year.

123.    He was out of school without his mandated services for a part of the 2019-2020 school year, after which time he enrolled in a center-based program.

124.    He is returning to the center-based program.

**Defendants have Subjected Plaintiffs to Systemic Practices**

125.    Defendants have failed to ensure that they have appropriate policies and procedures for implementing student's stay-put or pendency services. As a result, students like J.V. are denied their pendency services while hearings are pending.

126.    Defendants have failed to ensure specifically that children with Autism attending District 75 programs are receiving their full-mandate of related services.

127.    Many children, like D.A., end up "underserved."

128.    Defendants do not provide legally sufficient notice to parents like D.A. to advise them of gaps in related service implementation.

129.    Defendants do not automatically offer make-up related services for underserved children with Autism who are supposed to receive special education and related services through District 75.

130.    Under Defendants' policies and practices, Defendants' IEP teams cannot recommend the following services on J.V.'s IEP absent litigation:

      a.  1.1 instruction by a teacher during the school day in a special education class setting;

      b.  1:1 ABA program;

      c.  1:1 ABA services;

      d.  ABA supervision; and

      e.  After-school special education and/or related services.

131.    As a result, parents, like D.A., have to file litigation to obtain an order for these services.

132.    However, due to the fact that the Defendants do not offer ABA services or a 1:1 program. even when parents like D.A. win a hearing, they can end up without options, forced to engage in self-help.

133.    However, there are very few private ABA programs in New York and the ones that exist are very expensive and generally force the parents to pay for or contract to pay for the program.

134.    The Defendants must create programs for children with autism, like J.V., who need 1:1 ABA programs during the school day.

135.    Parents like D.A. should not be forced to engage in self-help to obtain these services.

136.    In addition, there is a shortage of licensed Aba providers.

137.    NYSED has implemented licensing requirements for ABA providers. All ABA providers who are not employed by a school district or school must be certified by NYSED as a Licensed Behavior Analyst ("LBA").

138.    However, NYSED has not promptly certified LBAs or ensured that there are a sufficient number of them in New York City for the 2019- 2020 school year. As a result, there is a shortage of LBAs in New York.

139.    Further, the DOE has failed to ensure that there are a sufficient number of private ABA schools in New York City to meet the needs of children who need school settings with ABA instruction.

140.    The COVID-19 Coronavirus pandemic ("Pandemic") has exacerbated these issues/

141.    J.V. has been subject to these policies and practices.

142.    There is no remedy through the administrative process to address the claims raised here, as IHOs do not have authority to order the Defendants to refrain from applying policies and practices to J.V.

**The Statute of Limitations Does Not Bar the Action Relating to Claims Relating to Case No. 16215**

143.    Governor Andrew Cuomo tolled the statute of limitations under all New York State statutes as a result of the Pandemic.

144.    Executive Order 202.08 dated March 20, 2020 states - any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020

145.    Executive Order 202.14 "continue[s] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order to 202, for thirty days until May 7, 2020"

146.    Executive Order 202.28 continue[s] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.14, for thirty days until June 6, 2020.

147.    Executive Order 202.38 continue[s] the suspensions and modifications of law, and any directives, not superseded by a subsequent directive, made by Executive Order 202 and each successor Executive Order up to and including Executive Order 202.28, for thirty days until July 6, 2020.

148.    Courts adopt the three-year statute of limitations in N.Y.Civ.Prac.Law 214(2) to IDEA attorney's fees claims, as the IDEA does not include a limitations period for filing such claims. *Robert D. v. Sobel*, 688 F.Supp. 861 (S.D.N.Y. 1988)

149.    As federal Courts adopt state limitations periods, New York State tolling rules will apply. *Board of Regents of University of State of N. Y. v. Tomanio*, 446 U.S. 478 (1980)

150.    The applicable statute of limitations in New York relating to attorney's fees and all other claims, to the extent they would have been time-barred, were tolled by the New York State Governor.

151.    Plaintiffs' claims for equitable and declaratory relief are timely filed regardless of the toll.

152.    Plaintiffs' claims for compensatory services and additional equitable relief are not time-barred.

153.    The Defendants have failed to provide specific notice of the number of hours that were provided to J.V. pursuant to pendency.

154.    The Defendants still owe services to J.V. under the 2017 Decision and those services do not expire.

155.    Even if the claims are otherwise untimely, they should be equitably tolled in light of the Covid-19 Pandemic and the fact that Defendants represented to Plaintiffs that they wished to settle and then withdrew their agreement to settle the Fee Claim.

156.    Defendants predetermine every IEP for J.V. which, as a result, causes his parents to have to remain in a constant state of litigation to maintain his program.

157.    Defendants do not recommend the services that constitute J.V.'s stay-put placement on IEPs.

158.    Defendants do not employ staff that are available to deliver the programs and services that constitute J.V.'s stay-put placement.

159.    Defendants have not ensured that their menu of service options for children with autism includes the ABA services that are part of J.V.'s stay-put placement.

160.    The only way for the Plaintiffs to maintain J.V.'s stay-put placement, including ABA, is to engage in litigation.

## **CAUSES OF ACTION**

### FIRST CAUSE OF ACTION
### SECTION 504 OF THE REHABILITATION ACT

161.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

162.    Defendants' conduct is knowing, intentional, reckless, and gross.

163.    J.V.  is a qualified individual with a disability entitled to protection under Section 504.

164.  Defendants discriminated against J.V.  under Section 504 by, *inter alia*, denying him reasonable accommodations, adopting systemic policies, procedures and practices that violate J.V.'s rights under the IDEA and New York State law, and engaging in widespread and pervasive violations of the IDEA and New York State Education law.

165.  Defendants discriminated against J.V.  under Section 504 by, *inter alia*, committing extensive, repeated, gross, knowing and reckless violations of multiple provisions of the IDEA and New York State law.  Defendants also discriminated against J.V. under Section 504 by repeatedly failing to implement pendency and final orders and repeatedly failing to offer J.V. a FAPE for the school years alleged herein.

SECOND CAUSE OF ACTION<br>THE IDEA

166.  Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

167.  Defendants did not offer J.V.  a FAPE for the school years alleged herein.

168.  Plaintiff has exhausted the administrative procedures for each of the school years alleged herein, as required by the IDEA.

169.  Except for the current school year which is currently being litigated, IHOs have found that the Defendants failed to provide J.V.  a FAPE for each of the school years at issue in this complaint – 2016-2017, 2017-2018, and 2018-2019 SYs.

170.  Defendants' application of blanket policies and practices repeatedly deny J.V.  a FAPE and violates the IDEA.

171.  Defendants have repeatedly failed to implement J.V.'s stay-put rights under the IDEA.

172.  Defendants have failed to implement fully the final decisions of the IHOs for the school years at issue.

173. Defendants have repeatedly failed to comply with the IDEA's procedural requirements, including its mandate to provide Plaintiff due process responses to her DPCs and to hold proper resolution meetings. Even when Defendants have provided due process responses to the DPCs, they are often form responses that do not fully comply with the IDEA's notice requirements.

174. Defendants engaged in systemic predetermination by refusing to individualize IEPs for J.V and to offer services that should be available under the IDEA.

175. Defendants denied D.A. her due process rights under the IDEA.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983

176. Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

177. Defendants have violated 42 U.S.C. §1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

178. By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Defendants have denied J.V. the educational services to which he is entitled under the IDEA and New York law, in violation of 42 U.S.C. § 1983.

179. By failing to supervise and train their employees and agents concerning the federal and state laws and policies concerning general and special education services, Defendants have violated 42 U.S.C. § 1983.

180. By failing to ensure that the pendency orders, decisions, and FOFDs were implemented, Defendants violated 42 U.S.C. §1983.

181. The Defendants violated Plaintiff's rights under 42 U.S.C. § 1983 by failing to have adequate policies, procedures, protocols, and training to ensure that the provisions of the IDEA and Section 504 referenced herein were complied with, which deprived J.V. of his right to a free and appropriate education under federal and state law.

182. Under color of state law, the Defendants deprived J.V. of his right to educational services afforded to him under New York State law, in violation of the Fourteenth Amendment of the U.S. Constitution.

183. As a direct and proximate result of the Defendants' misconduct, J.V. has suffered and will continue to suffer harm, unless Defendants are enjoined from their unlawful conduct.

FOURTH CAUSE OF ACTION
New York State Law

184. Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

185. Defendants have violated New York State Education Law.

186. By failing to enforce the settlement agreement, Defendants have violated New York State law.

187. The Court has pendent jurisdiction over any state law claims.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court:

i. Assume jurisdiction over this action;

ii. Issue a declaratory judgment that Defendants have violated Plaintiffs' rights as alleged herein and that the policies and practices complained of violate the IDEA, Section 504, Section 1983 and New York State law.

iii.   Issue a preliminary and permanent injunction directing Defendants (a) to implement J.V.'s pendency by timely funding the providers; (b) provide compensatory education and additional equitable relief to compensate for any outstanding services and relief order by the hearing officers in the school years at issue that were not yet implemented; and (c) create a special needs trust on behalf of J.V. with sufficient funding to cover the costs of the compensatory education.

iv.   Award Plaintiff reasonable attorneys' fees and costs in accordance with her status as the prevailing party in the hearings, and the work implementing the decisions;

v.    Award Plaintiff reasonable attorneys' fees and costs incurred in connection with this action; and

vi.   Award such other, and further, relief as to the Court may seem just and proper.

Dated:         July 6, 2020
               New York, New York


                                        Respectfully submitted,

                                        THE LAW OFFICE OF ELISA HYMAN, P.C.

                                                 */s/ Elisa Hyman*
                                        By_____
                                        Elisa Hyman, Esq.
                                        The Law Office of Elisa Hyman, P.C.
                                        1115 Broadway, 12th Floor
                                        New York, NY 10010
                                        Phone: (646) 572-9064
                                        Fax: (646) 572-9055
                                        elisahyman@gmail.com